The next case, United States v. Natal Morales. May it please the Court, my name is Jesse Siegel. I represent Hector Natal. Mr. Natal is currently serving three life sentences, a sentence of 20 years and a sentence of 40 years, all to run concurrently. There is no question that what happened on March 9, 2011 was horrible and tragic. On that day, Jaquetta, Kayshawn and Wanda Roberson died in a fire set by my client, Mr. Natal. It appears true that the act was intentional, but there's not a shred of evidence in the entire record of this case to show that Mr. Natal intended the consequences of his act. Do you agree that your client did not object to the form of the district court's jury instructions and that the adequacy of these instructions should now be reviewed under plain error standard? Yes, I do. If so, is it clear under current law that the admission of Morales' grand jury statements violated Crawford? I believe it is true. How so? Because it constituted a testimonial hearsay. It was objected to. Once it was objected to, then the defense counsel was put in the position of having to formulate a defense based on the ruling the court made. The testimonial hearsay was overwhelming. It was not a stray comment. It was not confined. It took up twenty-five pages of the trial transcript reading that grand jury testimony. The court gave limiting instructions in regard to that. Is that correct? Judge, the court did. I just believe that the instructions were inadequate and simply could not have been adequate. No instruction could be adequate. Is that your position? That is correct. Under Crawford, under Bruton, under Richardson, the Supreme Court has said that in a situation like this, even adequate limiting instructions are not sufficient. I think that was extremely clear based on the instructions that were the quote-unquote instructions that were given during the course of reading that testimony. It's not even clear that those instructions were actually directed to the jury. There's really no reason to believe the jury would have picked up on the colloquies that were between the court and basically the government. I don't know if I'm incorrect, but it looks like my time is already up. Thank you. Mr. Sandick? Good morning. May I please the Court? My name is Harry Sandick. Along with George Lobiondo and Patricia Kim, I represent Hector Morales on appointment under the Criminal Justice Act. The government concedes error on our Yates argument, which should lead to the 1519 count being vacated and a de novo resentencing, particularly in light of yesterday's decision in United States v. Powers. We intend to submit a 20HA letter, but given the recency of the decision, we haven't yet. We're prepared to address all the issues, but I plan to address only two. First, the improper surprise use of lay testimony by the government to offer the cell tower evidence, and secondly, the procedural sentencing error made. As my colleague said, we understand that this is a very serious case, but even in serious cases, the rules of evidence and the sentencing guidelines should still be followed. Do you think that there are any aspects of cell phone tower location analysis to which lay opinion witness could properly testify? As I think the Fourth Circuit even conceded, which has a rule that we think supports reversal here, certain very bare bones summary evidence essentially putting in, you know, records through a records custodian and perhaps some sort of demonstrative exhibit accompanying them. Where it goes beyond that is where the testimony goes into how cell phone towers operate, how cellular network operates, technical details about these operations. Did Deer Cline object? Yes. There was actually extensive colloquy. The scope of the testimony? He objected to all, they objected to all of the testimony. The argument essentially was that this had been discussed with the government prior to trial and that it came as a surprise to the counsel for both defendants that this testimony was being offered and that it was being offered through lay testimony. The district court allowed it in for a very narrow purpose, which was the purpose of what the agents thought, why the agents conducted their investigation. But then in rebuttal summation, the government essentially drove a truck through that hole that the government – I mean, I'm sorry, that the district court gave them, saying that we know that the landlord was not responsible because the cell tower evidence shows it, which is well beyond what the district court allowed the cell tower evidence in, sort of compounding and worsening this error. Was there an objection at that point in the government summation? I don't believe there was an evidence during the government – there was an objection during the government summation. The testimony of Trowicki, right, the custodian, he testifies on how cell phones' towers operate, but isn't it possible that admitting that testimony that it was harmless? For example, that a handset will jump to a stronger signal even without physical movement? That's not directly related to the location of Shamash's cell phone, and it could have even been unfavorable to Shamash, since it tended to suggest, perhaps, that it is not straightforward to gauge the based on the location of the tower to which the phone is connected. Well, Your Honor, we would say that it isn't harmless error here, and the reason for that is that even though perhaps certain arguments could have been drawn from aspects of what Trowicki testified to, there was all sorts of other evidence that defense could have offered had it known, had it been disclosed under Rule 16, or had there been an adjournment granted at that point, which was one of the things requested by the defense. The question isn't whether there was sufficient evidence without the excluded evidence, but essentially whether this Court can be sure that the error didn't influence the jury. In a case where the three witnesses were very flawed cooperators, you had an ex-vengeful girlfriend of my client's son, you had a drug dealer who was never signed to a cooperation agreement, basically just given a pass for everything, and then Mrs. Batts, a woman who changed her story after being threatened by the police, this was the forensic, independent evidence. It was not oak tree corroboration, and it ruled out the main defense. I would have liked to have also addressed the sentencing issue, but I do see my — Go ahead. It's just in a minute. Okay. I'll keep it very brief, Your Honor, and I appreciate the Court's indulgence. The defendant was sentenced based on a guidelines range that included a multiple count enhancement, and under Section 3D1.2 of the guidelines, in Commentary Note 2, it states that where society at large is the victim of an offense, you group, you don't do a multiple count enhancement. And although there were obviously three victims of the murder, of the arson, that was committed by my client's son, my client was not a principal, he wasn't an aider and abetter, he was an accessory, and we have centuries of jurisprudence, including Blackstone, including the U.S. Supreme Court, Lefebvre, that all make clear that an accessory violates rules that relate to how our justice system operates. They don't harm the underlying victims of the underlying offense, and that without the multiple count enhancement, my client would have stood to face a lower guidelines range. How do we know whether the accessory charges actually involve substantially the same harm? Well, the three accessory counts all grow out of my client's driving his son away after the arson and then committing certain other post-crime acts. There was also a conviction for obstruction of justice. These are all offenses against the justice system, not particularly against these three people. When my client drove his son away, as it's alleged that he did, he had no idea whether there were no people in the house, three people, 30 people. It was a crime as it was charged by the government, not as a principal, not as an aider and abetter, but merely as an accessory, which is a serious crime, and he should get a serious sentence for that. But he shouldn't have been sentenced as if he were a principal, and that is the error that the district court made. Thank you, Your Honor. Good morning. May it please the Court, my name is Mike Gustafson. I'm with the U.S. Attorney's Office here in the District of Connecticut. With me at Council table is the U.S. Attorney Deirdre Daly. Together we are the trial team in this case. If I could start, Your Honor, with clarify one thing about the cell phone issue. Counsel said that was a rebuttal closing argument. It was actually in the first summation, and I was the attorney addressing the jury at that point, so it was me who said that. I was there. If you're talking about cell phone testimony, if let's say, if expert testimony is required on some aspects of cell phone tower locational analysis and not on others, how should we draw the line? I can tell you in this case the line was drawn appropriately. I suppose in cases going forward it would have to be on a case-by-case basis. In this case, while in cases I've used experts, for instance, in a bank robbery where you're tracking the fugitive and his flight from a certain area to where he might have been apprehended or where evidence was later recovered, I think it's undisputed, and the government certainly agrees, expert testimony is appropriate there. You're using cell towers, the space of the cell tower, and the intricacies of that analysis would be applicable in those kind of cases. In other cases here, it was simply Mr. Chewicki came to court, looked at the company's phone records, had certain columns, what phone number was called, what phone number was used to make the call, what time it was made, and then in another column, what cell tower, where it was located. Let's say, I mean, when you talk about a tower being many miles away or many sectors away, you're still trying to, you still need to know something about the radius, don't you? If the tower was in East Haven, Connecticut, or a town next to New Haven, perhaps it becomes a much closer question, but this was in New York. It was in Flushing, Queens, New York. I think common sense would carry the day in that particular situation, which was the situation we had in this trial. As we've gotten closer, if Mr. Shamas, the landlord's phone, pinged off an East Haven, Connecticut cell tower, we probably would have looked at that with an expert as opposed to simply the business record and say, Flushing, New York. I think in closing, just to close the circle on that point, I don't know if I drove a truck through the hall, but certainly I think it was a reasonable inference to draw from the fact. Common sense, again, to the jury. Mr. Shamas did testify. He was cross-examined. One of his workers who was on the phone with him that night at 140 in the morning, Jonathan Ortiz, he also testified. These folks were cross-examined, and the permissible inference was Shamas, as he told you, his phone was in Flushing, New York. It seems to me that the records person certainly tried to explain, was allowed to explain the way in which the cell phones interact with the towers. That's not within the can of the records custodian. It seems to me it clearly was expert testimony. The issue in my mind is whether it was harmless, whether there was prejudice. Are you taking the position that that testimony is appropriate for a records custodian? No, sir. I think it went beyond the records custodian. Actually, though, I think, if anything, it inured to the defendant's benefit in that it allowed for the possibility that the jury concluded, wait a second, these cell towers, the phones don't always go right to the nearest cell tower. It's possible that the phone was not in very close proximity to the Flushing Queen's Tower that Trewicki identified. I think I want to bring that out for the jury only because they didn't want to make it seem ipso facto. His phone, Mr. Shamas' phone, is literally underneath the cell tower in Flushing Queen's. It could have been a fair distance away. So Your Honor, on the harmless issue, just to follow up on that, at the end of the day, this goes to whether Mr. Natale committed the arson. And in the trial record, the jury had, among other things, Mr. Natale's tape-recorded statement to Gabriel Vega that he burnt the cell tower. We had statements from Natale to Chad Mendez that Vega overheard. We had Natale's own statement recorded from prison to his girlfriend that, okay, my voice is on the phone, but it's there because the government had my voice from another recording and spliced it into the recording. Where trial counsel argued that Mr. Vega threw his voice and pretended to be Mr. Natale when that recording happened. So there's abundant evidence before the jury to simply say, okay, Natale submitted the arson several different ways, and there's corroboration coming from various sources. So at the end of the day, if I overstepped on the cell phones with Mr. Chewicki, I think it was clearly harmless. The other, I'm sorry to ask you about the, uh, Morales' grand jury testimony. Sure. Uh, the statement that I want to ask you about is Morales' answer. He says yes to the prosecutor's question, quote unquote, because you had heard that he had previously been accused of trying to light a fire in that building. Maybe he lit the fire that night, close quote. In other words, uh, is it perhaps the case that this statement was so prejudicial to Natale and of such limited probative value with respect to the non hearsay purpose for which it was of showing that Morales lied to the grand jury that Natale can argue that the admission of this statement with or without the limiting instruction violated rule 403. What's your response? Thank you, Your Honor. Um, I don't think it does. Um, it was, the court was very clear at two points to tell the jury that these statements, none of the statements, including this one, were offered on the arson or the attempted arson. And I want to answer Your Honor's question, but I do want to back up for one second because there's certainly a thread through the briefing and then the argument this morning that the judge really didn't instruct the jury about the arson and the fact that this testimony, this evidence was not coming in as the arson. If you look at the joint appendix 2762 and 63, when Judge Arderton instructed the jury the second time, because she did twice during the admission of this evidence, that the grand jury testimony was not to be considered for the arson or the attempted arson, that second time was prompted by defense counsel requesting her to do that. And in requesting, defense counsel said, I know Your Honor's already instructed the jury once, but could you do it again? Now, I was there that day and I read the transcript and in hindsight I said, what was going on? And I was never ill at ease that the judge was simply talking to the lawyers without looking at the jury. Judge Arderton's a very careful jurist and I think that, that cite the 2762 of the transcript confirms, and in the case of the grand jury testimony, Judge Arderton did not instruct the jury. This stuff is not to be considered on the arson. But to get to your question, Your Honor, I don't think Mr. Morales' testimony was really indicative of his furtherance of the obstruction conspiracy. He was giving different accounts as to why he called his son right at 136 in the morning as to why the fire, when the fire was raging, to see whether he was there, and then he admitted that his son was never in that building, or he heard a phantom voice. So these were things that Mr. Morales testified to the grand jury in order to obstruct the investigation into who committed the arson. Could you address the groupings issue? Sure. That's a, that's a close call, candidly, Your Honor. I think if this court is to start from the premise that an accessory after the fact is absolutely, at all, in all times, a crime against society, then I think my colleague, my opponent, has the better of the argument. I would respectfully submit that accessory after the fact is not always simply a crime against society in general. If you look at the guidelines in Section 3D 1.2, it start, it starts, it doesn't start, but in the middle of the application note 2, it talks about the concept of if there is no identifiable victims, for example, a drug or immigration offense. In this case, there were identifiable victims. Sadly, three dead people were burnt horribly in this arson. And if the court is to overturn that sentence and send it back for a new sentence, as a prosecutor with responsibilities to victims, we have to call all three victims or their estates. We're not going to simply say, oh, well, society's been harmed, so no need to alert people to a new sentencing proceeding. We're going to call those, the Robersons, the 8-year-old boy, the 21-year-old woman, and the 40-year-old woman. All of them and their families would be called. So I think there are identifiable victims. And if the court goes beyond the notion that accessory after the fact is simply a crime against society in general, then I would respectfully submit that the guidelines do allow for an accounting of the entire harm done. Is it your view that the district court made specific findings that Morales knew or reasonably should have known that the three deaths would result from the arson? Yes, Your Honor, because he was busy. He was obstructing the investigation in the days and weeks and months after the arson. It was public information that people died that immediately. It was on the streets that people had died. But certainly the next day, it was clear that three people had died. So Mr. Morales, unless he was living under a rock, absolutely knew that three people were dead within hours of the arson. I see my time is up, so unless the court has any questions, I'd rest from the papers. Thank you. Thank you, Your Honor. Judge, to respond to the question about the impact of both the grand jury testimony and the rest of Morales' statements that were introduced, I just think, you know, there's a prior case in this court, I believe it was Jones, when the court referred to that sometimes it's just unrealistic to expect a jury to perform mental gymnastics and ignore powerful evidence despite, admittedly, despite jury instructions by the court. And I just think that looking at this in its totality, that's the situation we have here. The part that, Your Honor, asked the government about where it has even more to it if you back it up a question. And in that answer, Mr. Morales, it almost implies that he knew more information and easily could have led the jury to believe that it wasn't simply the fact that he had been accused of the crime a year ago. He also says he heard somebody mention his name and easily could have been taken as implying that he had some sort of inside information. Furthermore, we then also look at the fact that the government was able to elicit through Jessica Feliciano, Mr. Natal's former girlfriend, statements made to her by Mr. Morales in which Mr. Morales said that he had driven Mr. Natal from the scene of the fire to her house and that he should essentially take the weight for the crime on behalf of his son. So you combine all these things and Mr. Morales is becoming an extremely important witness against Mr. Natal without ever having to testify in court and without ever being cross-examined by Mr. Natal. And again, going back to the metaphor that was used, this was really driving the truck through the opening. It seems the government had not been able to restrain itself during the grand jury presentation from cross-examining Mr. Morales in essentially to bury Mr. Natal and then that comes in. So I think that no instructions were adequate. I may have misspoken earlier when I said that the court's instructions, I don't recall if I said they were proper or that they were adequate, but they were proper but they were inadequate. Thank you, Your Honor. Just briefly, first with respect to whether an error on the cell site issue was harmless error, it's not a question as I think the government may have been framing it of whether there was sufficient evidence apart from the inappropriate evidence. The question is whether we can be sure that the error did not influence the jury. And I apologize if it was in main summation rather than rebuttal if I was mistaken, but just looking at how it was presented to the jury I think should demonstrate that this was not harmless error. The government says about Chamash, we know he was in Queens the night of the fire and we know from the representative from Sprint how cell phones work. And later in that same portion after reviewing what the record showed, he said, I don't think that there is any dispute that Mr. Chamash was not in New Haven. And that really cuts to the center of it. They use this to argue that the defense in this case was, or one of the defenses in this case was indisputably wrong. On the subject of the grouping analysis, the language in 3D 1.2 note 2 states, for offenses in which there are no identifiable victims, e.g., drug or immigration offenses, comma, where society at large is the victim. That's what we're saying here, that the way in which the government charged this case, they could have charged it if they thought it was provable that he was an aider and abetter under Section 2. They chose to charge him as an accessory. And as an accessory, it falls into that parenthetical that although there were obviously victims from the arson, the victims from the accessory offense are not the same as the victims from the arson. I see my time is up. Thank you. Thank you all for your arguments. The Court will reserve decision. Thank you.